JOHN T. DICKINSON, *et al.*, plaintiffs in error, *vs.* TALIA-FERRO JONES and JESSE M. THORNTON *et uxor*, defendants in error.

Threatened waste or destruction of timber land, by sawing up the timber or deadening timber land preparatory to opening it for cultivation, or cutting the wood for firewood and sale, by any life-tenant or person claiming through such an one, will be promptly and efficiently restrained by a Court of Equity upon application by any remainderman.

(The Chancellor is ordered to grant the injunction.)

*Rule nisi* for injunction. Decided by Judge VASON, Chambers, April, 1867. Dougherty County, Georgia.

JOHN T. DICKINSON, for himself, and in right of his wife, Julia, and his children, Henry G. Rogers and John T. Dickinson, Jr.; and William Q. Dickinson, for himself and his wife, Cornelia, and as trustee for the wife and children of Richard A. Dickinson, deceased, to wit: Archibald and Zelima Bell Dickinson, averred that the aforesaid are the children and grand-children of Roger Q. Dickinson, late of said county, deceased, and as such are entitled to an estate in remainder, in a certain plantation in the 1st District of said county, described in the third item of the will hereinafter set forth, containing 1,500 acres, more or less, which was devised by said Roger Q. Dickinson, by his last will and testament, to his wife, Catharine.

In support of this averment they attached as an exhibit to said bill a copy of said will, the items of which are as follows:

ITEM 1ST. I desire that my executors, as soon after my death as possible, from the sales of crops and other means I may have, shall pay all my just debts.

ITEM 2D. I have heretofore advanced to each of my sons John T. and Richard A., in lands, negroes, stock, &c., amounting to the sum of $8,000.00 each, which said property I hereby convey to them in fee; for the purpose of making my wife, Catharine, and my son William Q. equal with my said sons, I do hereby give to my wife, Catharine T. (in lieu of her

dower interest,) to be held by her in fee forever, the following property: (here follows the names and ages of four slaves;) also, three choice mules, ten head cattle, twenty head of stock hogs, provisions for negroes and stock for one year, and my carriage and match-horses; which property I estimate to be worth $8,000.00.

The balance of this item is a bequest to William Q. of slaves and other personalty to the same amount.

ITEM 3D. I wish my plantation lying east of Flint River, in the First District of Dougherty, to be divided into two parcels, by a line as follows: beginning at the south-west corner of lot number 193 and the south-east corner of 199, thence north on the line to the Flint River, all the land lying west of that I do hereby give to my wife, Catharine, during her life, with remainder over to my children, as hereafter provided: the eastern portion of said plantation I do hereby give to my son William Q., to be held by him as hereinafter stated.

ITEM 4TH gives to his son John T. certain lands therein described, to be held by him " as hereinafter provided."

ITEM 5TH gives to his son Richard A. certain lands (describing them) in fee, and certain other lands (describing them) to be held and enjoyed by him "as hereinafter provided."

ITEM 6TH. "The whole of the balance of my estate, both real and personal, I wish to be equally divided between my wife, my sons, John T., Richard A., and William Q., share and share alike, that part of share to which my wife may be entitled, as well as the lands hereinafter devised to her, to be enjoyed by her during her life, with remainder over to my children." The remaining parts of this item directed that the property given to said John T. and William Q. (except that given in fee) shall be held in trust by each of them for his and his wife's support, and for the support and education of their respective children, not to be subject to the husband's or wife's liabilities or contracts, and at their respective deaths to vest in their children ; and the executors shall hold Richard A.'s (except that given him in fee) upon the same terms,

with power in the executors to deliver the same to Richard A. when they are satisfied that he is steady and provident.

ITEM 7TH. Should either of my boys die without leaving children or wife him surviving, the whole of the property herein conveyed, except such as is given them in fee, shall be divided equally between my surviving children. Should either of them leave a wife and no children, then the wife to have a lifetime estate in the same, with remainder over as herein before stated.

The balance of the will directs the lands to remain undivided till the crop shall be gathered; gives the executor power to sell at public or private sale, on such time as they think best for the estate, and appoints said Catharine, said John T., and David A. Vason, executors. [It was made 29th April, 1858, and probated 14th June, 1858.]

They averred that said Catharine took possession of said plantation under and by virtue of said will, and married John Thornton, who took possession of it by virtue of said marriage; that when testator died, and when Thornton so took possession, said lands were used as a plantation for farming purposes, and were so desired [designed]; but since that time, said Thornton has [injured] and is injuring and damaging the said plantation, by cutting and selling off said lands the most valuable timber upon the same; to wit, large quantities of ash and hickory from the river lands, to the permanent injury of said plantation, which is not necessary to the enjoyment of the plantation for farming purposes; that Thornton has contracted to said Jones the privilege of using the timber on the woodlands belonging to said plantation, for the purpose of being sawed up into lumber; and said Jones is preparing to erect a steam saw mill on or near said lands, for the purpose of sawing up said timber.

Timber is becoming scarce in the neighborhood of said plantation, and if these things are persisted in said remainder estate will become of little value.

They further averred that there is an abundance of open land on said plantation for the full and free enjoyment of said life estate; but Thornton and Jones are having a large quan-

tity of timber deadened, merely as a pretext to cut the same into lumber; that this is pine timber, which, for rails and other farming purposes, is very valuable many years after it is dead. Many of the remaindermen are mere children, and this remainder estate is almost all they have, and said defendants are not able to pay damages. Without restricting the proper use of said life estate, they prayed an injunction against the acts of waste aforesaid.

The Chancellor granted an injunction to last until the hearing, and ordered the defendants to show cause why he should not extend it.

· Thornton and Jones each answered the bill, and admitted all the charges in the same, except as follows:

Thornton says that in right of his wife, the life-tenant, he is entitled to all the enjoyment of said life estate in as full and ample a manner, for that term, as though a tenant in fee; and in exercise of that right he sold and conveyed to said Jones his entire interest in one of those lots; that he is not bound to use the property as a plantation only, but in any way he sees proper, so that he does not ruin or destroy the freehold. He denies that he is injuring or damaging the plantation; says he has cut and sold a small quantity of the ash and hickory off some of the swamp lands not susceptible of cultivation, leaving enough timber on the land to furnish all the plantation will need till the lands will be worn out. He denies that there is sufficient open land on the plantation, stating that testator gave his wife fifteen or twenty able hands; that the cleared lands were not sufficient for this force, and some of it was worn out, and he had a right to clear more; and that this clearing will not injure, but will benefit the remaindermen's estate by $2,000.00. He states that after the sap has rotted from deadened pines, they are sometimes used for rails, when green timber cannot be had; but that there will be sufficient green timber on this plantation till it is worn out and worthless; that Jones is intending to saw up only the timber already dead and decaying on the land, and unsuitable for rails; and that he (Thornton) intends clearing no more, as he now has sufficient cleared. He says nothing as to insolvency.

Jones' answer is the same, with these variations: He says the deadening of the timber was only for purposes of cultivation; that he has only deadened part of one lot of the land, about one hundred and sixty acres, leaving between eighty and one hundred acres, which is sufficient for fencing the same hereafter; and that this clearing will increase the value of the remainder estate by $500.00; and that he 'is amply able to respond in damages.    Both deny all fraud and *mala fides.*

At the hearing, several witnesses were examined orally, and their evidence put in writing afterward by consent.

Said JONES introduced by complainant testified that he did not purchase said lot, for the purpose of erecting a saw mill; but a short time after he bought the life estate in the same he did propose to contract with one Fletcher, who owned a steam saw mill, situate in Albany, to remove it and put it in operation on said lot, and he intended sawing all timber on the lot suitable for sawing; that this timber was well suited for sawing; that he thought he had a right to do so; and that there was plenty of timber for the plantation. besides that on his lot.

E. C. HELMES testified for complainants that if the said Jones' lot was wholly cleared, it would benefit the life estate and injure the remainder; that if he owned Dickinson's plantation, he would prefer the timber should be deadened and left standing rather than have it cut off; that this dead timber made the best of rails; that there was about three hundred acres of the river lands, and about five or six hundred acres of pine lands, and about seven hundred acres of cleared lands; that there was but little timber on the river lands suitable for rails; that the oaks on the river were generally good for rails, but that gum, ash, and other kinds of trees, (of which there were a great many,) were unfit for rails; that the pine lands were well timbered, and contained more rail-timber to the acre than the river lands; that the open lands had but little rail-timber on them, and the fences were in bad order.

I. JACKSON testified for complainants that he owns the

adjoining plantation to said Dickinson plantation, and is familiar with it; that there are about five hundred acres of wood fit for rail timber; that the wood on the river is unsuitable for rails; that the Jones lot is embraced in that part which is fit for rail timber; that on the old, or open lands, there is no timber of consequence fit for rails, and the fences are bad and need repairing. Cutting off the timber from the Jones lot would very greatly damage the remainder estate, and much greater than by only deadening the timber and leaving it standing; that much of it would stand for twenty years, and being heart-pine, would make best of rails; that in twenty years timber in that section will be of great consideration; that cutting it all off of said lot would injure it ten dollars per acre; that one half of the plantation is now cleared, and has but little rail-timber on it.

Defendant read the affidavit of E. C. Helmes, J. W. Reynolds, and J. M. Thornton, (complainant,) to the effect that they knew the Jones lot; there was an abundance of timber or uncleared land on said estate, being about seven hundred acres cleared and nine hundred uncleared; and if the whole Jones lot is cleared and the timber deadened and left on it, the value of the estate will be greatly enhanced, and if it is all taken off of said Jones lot the estate will be still more enhanced, because there is abundance of timber still left; the cleared land near Albany rents high, and even pays good profits on investments, and clearing this Jones lot will enhance the value, by saving expense of clearing every spring, and by saving damage to crops by falling timbers.

JNO. R. HILL, by affidavit, stated that he was well acquainted with the plantation aforesaid, and with the Jones lot; that in his opinion there will be sufficient timber on the same, (exclusive of the Jones lot,) together with what will be left on the Jones lot after cutting what is suitable for sawing, to fence the place for a number of years; that if Jones clears the wood land and fences it well, the clearing will be worth for agricultural purposes fully as much as the timber for sawing would bring at present market prices; that if, after fencing the same, Jones should cut off all the timber, it would

Dickinson, *et al.* *vs.* Jones and Thornton, *et uxor.*

enhance the value of the remainder estate, by saving time in removing falling timber from year to year; and that when cleared said Jones lot will be worth more than it now is.

Upon this the Chancellor refused the injunction, and for this error is assigned.

WRIGHT and WARREN, solicitors for plaintiffs in error.

STROZIER and SMITH, solicitors for defendant in error.

HARRIS, J.

The refusal of the Circuit Judge to grant the injunction applied for by the remaindermen against the purchaser of the life-estate in the lands, to stay the waste being perpetrated by such tenant, as the destruction of the growing timber, clearing up the wood lands to put them in cultivation, &c., evinces the necessity of collecting and presenting old and familiar principles of the common law touching the respective estates in fee simple and life estates in lands, so as to remove the misapprehensions which so generally exist in the popular mind in reference to them.

An estate in fee simple is the *entire* and *absolute* property in the land; no person can have a greater estate or interest. The tenant or owner in fee simple is the *absolute* master of all the houses and other buildings erected on the land, as also of all wood growing thereon, turf, mines, &c.

A life estate is created by devise, deed, or operation of law. Thus a gift by deed or devise of a parent to a child of a lot of land during the life of such child, remainder to the child or children of such child, carves out a life estate for the child of donor or devisor. The remainder is an absolute estate in fee simple to the grandchild or grandchildren.

So, too, a life-estate is created by law where dower, or one-third of the land for life, is assigned to the widow. All estates for life, however created, are of the same duration, having the same rights, privileges, and incidents, and are subject to the same restrictions in their enjoyment.

Now the enquiry is, what does a tenant for life acquire—

or rather, what is the extent of his estate? He acquires the *usufruct* of the land, or in other words, the right of *using and enjoying the annual produce of the land* during life, *without doing damage to the absolute property in the remainderman.*

Ld. Coke in 1st Institute, 53, b, cited in 1st vol. Cruise Dig. Real property, p. 79,—lays it down as law, that tenant-for-life may cut timber trees, (that is, trees twenty years of age,) at seasonable times, for the repairing of the houses or fences on the land; but he cannot cut down timber to build new houses, or to repair those that he has himself improperly let fall into decay.

Even in this case, should he cut down more timber than is necessary for repairs, it is waste. Viner's Abridg't Waste.

Cutting of *dead* wood for his own use for fire wood, will not be regarded as waste; but the tenant-for-life will not be allowed to turn any wood into coal, as long as there is dead wood.

The right of tenant-for-life extends no further than to cut *dead* wood for fuel in the house, and of timber for the making and repairing of all instruments of husbandry, and for the repair of houses and fences. Coke Institutes, 1. 41. b.— 2 Black. Com., 35–122.

He is not allowed to cut timber or to commit any other kind of waste.—Whitfield *vs.* Bewitt, 2d P. Wms 241; 2 Black. Com., 122, 281; 3 Black. Com., 224; Coke Litt. 53, a.

Timber is used technically to denote *green* wood of the age of twenty years or more, such as oak, ash, elm, beech, maple, and with us would include walnut, hickory, poplar, cypress, pine, gum and other forest trees.

*All timber belongs to the remainder man,* and the tenant for life has only a qualified property in it, and restricted to the uses before stated. See authorities quoted above.

The tenant-for-life cannot cut turf on bog lands for sale.— Co. Litt., 54, b.

He cannot dig for gravel or lime, clay, brick-earth, stone, or the like, unless for the reparation of the buildings or the manuring of the lands.

The changing of the course of husbandry, as by plowing up of an ancient meadow, was once held to be waste, but that has been altered.   Can it be doubted, but that by bad and careless plowing, by which gullies are created and the surface soil swept away, thus impoverishing the land, the tenant-for-life would be held liable for waste, if the foregoing legal principles were pushed to their legitimate results?

So too the cutting down of shade trees around the homestead, or trees planted for ornament, or fruit trees, has been held to be waste.

The tenant-for-life will be held liable for damages, if when he enters into possession, he suffers houses or fences not in a ruinous condition, to go into ruin when they might easily be repaired.

Some of the foregoing restrictions as to use of timber and clearing up of land, have been held in New York, in the case of Jackson *vs.* Brown, 7 John Repts, 232, as inapplicable to this country.   The answer to this case is, that these common law doctrines have not been altered by any legislative enactment, and are therefore obligatory on the Courts.

Such is the regard paid by the Courts to the protection of those having estates in remainder or reversion, that although the tenant-for-life holds by deed "without impeachment for waste by him," he will be permitted to cut timber only in a husband-like manner, nor will he be permitted to do *a permanent* injury to the inheritance.   1 Fonblanque Eq. 33, note; 1 Vesey 264; 6 Vesey 107; 1 John Ch. R. 11.

So jealous too was the common law as to the *abuse* of his estate by a life-tenant, that though it permitted him to sell or alien his whole estate or interest, or to create out of it a less estate than a life-estate, yet if he created an estate greater than that he held, and thus attempted to divest the estate in remainder or reversion, such conveyance operated as a forfeiture of his estate for life.

As to waste by the tenant-for-life, there existed at one time an idea that he was exempt from liability therefor, unless in his deed or title he was restrained by express words from committing it, growing out of some decisions to the effect

that because the person creating a life estate could impose such terms on the tenant as he pleased, and none being imposed, the life-tenant was held not answerable for waste in the absence of such terms.

This led to the enactment of the Statute of Marlbridge, Henry 3d, chap. 24, by which the owners of the inheritance or in remainder or reversion, were entitled in all such cases, to maintain action against the life-tenant, and to recover full damages for the waste committed.

This statute being found inadequate to protect the estate in remainder or reversion, against the strong disposition of the tenant-for-life to go beyond his privileges, the Statute of Gloucester 6, Edward 1st, ch. 5, (see Schley Dig.,) increased the punishment, by declaring that the land injured should be recovered by the absolute owner, together with *treble* damages as an equivalent for the waste or injury done the estate. 2d Inst. 144, 299.

The Satute of Gloucester is incorporated in Schley's Digest as of force in Georgia.

Several notices of its provisions may be found in the earlier decisions of this Court, and *obiter* it is doubted whether treble damages can in this State be recovered for waste. Whenever I shall find that this statute has been repealed or altered by the Legislative power, it will be my duty to conform to its will; but until better informed, I must regard that statute as of force. Indeed no case could be presented stronger than the one in this record, demanding by every consideration of justice, for injury already done, such reparation as this statute provided.

Injunction ordered to be sanctioned.